is 14-1-1-8-6 United States v. Cecilio Mercedes-De la Cruz Mr. Marks, good morning. Good morning, Chief Judge Lynch. May it please the court, Daniel Marks of Foley HOAG with me is Truti Tiwari. We represent the defendant, Mr. Mercedes-De la Cruz. I'd like at the outset to reserve two minutes of time for rebuttal. You may. Your Honors, this is a classic case in which the defendant, Mr. Mercedes, was illegally arrested before any drugs were found based on his mere presence in an area where criminal activity was suspected. Remarkably, his defense counsel spotted that glaring constitutional issue but failed to move to suppress his incriminating post arrest statements. Mr. Marks, there were two trials in this matter. In the initial trial, a pretrial order was issued requiring motions to suppress to be filed, what, two weeks before the trial? And counsel did not then file a motion to suppress. He later told the court that he didn't waive it. We'll put the waiver issue aside. But was there not a similar pretrial order in the second trial after the first one was a hung jury? I don't believe there was another pretrial order issued in connection with the second trial, but I think there's no dispute that at neither time did defense counsel either file a timely motion or make a request to file a motion out of time. Before trial, after trial, didn't he seek a new trial on the basis that the motion to suppress, which he hadn't filed earlier, should now be entertained and allowed? The first trial ended in a hung jury, Your Honor, which is why there was a second trial in this case. And I think that's an important fact to keep in mind because it goes to how thin the government's case was here and how desperately the government needed the post-arrest statements from Mr. Mercedes to make the case against him. This was a case where there were effectively no other witnesses, no fiscal evidence, no forensic evidence. There were damning confessions made almost immediately upon his arrest and again later at a police station, hours after his arrest, both of which came in through the testimony of the arresting agents. None of those And I take it there were no Miranda warnings after the arrest. There were Miranda warnings given at the police station. No, I'm talking at the arrest. You're absolutely right, Your Honor. There were no Miranda warnings given at the moment that Mr. Mercedes was arrested by the road in this area of Puerto Rico. So the government, what does the government argue was the strategic reason counsel failed to file a motion to suppress, which obviously he should have filed? Well, that's a very good question, Your Honor. At page 41 of the government's brief, the government asserts that this may have been a strategic choice. The government doesn't have the confidence in that position to say it actually was because I think the record doesn't bear proof that this was in fact a strategic choice for two reasons. The first is the purported strategy here, don't move to suppress so that you can cross-examine the agents at trial about the circumstances of those statements, was a strategy defense counsel never pursued. In other words, at trial, defense counsel for Mr. Mercedes didn't cross the agents about the circumstances of those post-arrest statements and try to argue to the jury the statements, the confessions were incredible or unreliable. So it's the strategy, it's the fiction alive by the record. The other reason why it's not an objectively valid strategy is, ironically, the case that defense counsel cites to the court after he's advised he's blown the deadline for a suppression motion is Crane v. Kentucky. Crane v. Kentucky stands for the proposition that you can file a motion to suppress, which goes to the legal issue of voluntariness, without inhibiting your ability to later, if your motion's unsuccessful, question arresting agents about the circumstances of an arrest because that issue goes to the factual dispute about reliability at trial. That's exactly what counsel should have done here and in fact it is what Mr. Guzman and Mr. Correa did. Those two defendants had motions to suppress filed, the court denied those motions and those defense counsel went on to question the arresting agents at trial. Here, Mr. Mercedes Lord did neither of those things. So what evidence did the government have at the time of the arrest? So not much, Your Honor. I think almost everything that the government cites goes to the area in which Mr. Mercedes was arrested and of course the government concedes, as it must, that the law from the Supreme Court is clear. Mere presence in an area isn't enough to get you probable cause. I think the best two facts for the government, and I want to take them both on, are number one, that the government contends Mr. Mercedes is emerging from the brush and undergrowth, as they put it in the brief, and number two, that he's moving toward this abandoned Ford truck on a road which has canisters nearby it. The problem for the government is the record doesn't bear out either of those suggestions. If you actually look at the testimony, considering about the arrest, and this is at page 539 of the joint appendix, what the two arresting officers say is, this is in the pre-dawn hours, it's a little before six o'clock and it's dark. One of the agents has night vision goggles and can see only a silhouette in the distance in the woods. His testimony is we heard a noise in the wooded area and observed a silhouette moving about. There's not a word about any brush or undergrowth. There's no suggestion Mr. Mercedes is hiding or doing anything suspicious that might lead to probable cause under a case like Illinois View Board Law. There's simply a person in the woods. In fact, at page 8 of the government's brief, when they set the scene in the facts section for the arrest, they don't even mention this notion that he's emerging from woods or undergrowth. Well, they do note that there's a likely drug delivery on the nearby beach. They've gotten word of that. So they've sent eight agents and six of them are sent down toward the beach and two of them remain on this road. And they have found a red expedition on the road? That's right, Your Honor. And you're absolutely right that this is an area in which law enforcement suspects there may be drug trafficking activity. No different than any other high crime area case going all the way back to Illinois View Ward Law. This Court, of course, has legions of cases dealing with high crime neighborhoods and the rule that that alone doesn't create probable cause for an arrest. Let me talk about the truck in particular. Do you concede that this is a high crime neighborhood? No, I don't think this would even go as far as those cases. What we this area, there's a vessel spotted at sea. There are also three suspicious vehicles spotted in the area, none of which, by the way, are connected in any way to Mr. Mercedes, even after his arrest. And then there's this one truck, which Your Honor mentioned. Am I correct that at that point they had not actually discovered drugs? You're absolutely right, Your Honor. Thank you. With regard to this truck, the other fact the government suggests, and I think it's a bit of an understatement, is that the agent is arrested as he's moving toward the truck. But again, that's simply not the testimony. What Agent Vega testifies at trial is that when they see this silhouette in the woods, he's moving toward us. In fact, in the government's brief, they say the agent saw a silhouette of a person moving toward them, not the truck. But aren't they standing next to the truck? They're standing approximately 25 or 30 feet away from this truck. Now, again, this is one of the ways that the government wants to have it both ways. On the one hand, they like to say it's dark. People shouldn't be out walking around when it's dark. On the other hand, they want to say that Mr. Mercedes is walking toward the truck. There's no evidence he even knows the truck is there or can see it. And there's certainly no evidence linking him to the truck that he's ever been in it or that he intends to use it as a getaway vehicle. I see that my initial time is expired. They can only see him through the night vision goggles. That's right. In fact, they can only see a silhouette of him is the testimony that's given. So it's unlikely he can see the truck for them. Absolutely. In fact, it's hard to know how the agent knows this, but his testimony, for what it's worth, is they don't believe Mr. Mercedes can see them. When they call out to him, you're under arrest. Also, mind you, their testimony is he immediately stops moving. He comes out of the woods with his hands raised, and he makes no effort to flee and almost immediately confesses. Okay, thank you. Ms. Jorgensen. Good morning, Your Honors. May it please the Court, Susan Jorgensen for the United States. Ms. Jorgensen, I think you see what your problem is. Lay out the facts that you think constitute probable cause to make an arrest. Yes, Your Honors. There's testimony throughout the record that this was known as a drug point for vessels to come in to Puerto Rico from Venezuela and other countries in South America. An arrest had been... Is there any record of that in the record? Yes, there is. There is testimony by the agent, Agent Capestany, who was doing patrols the night before that he had specifically been tasked with patrolling that area to look for suspicious drug activity. Yeah, well, that's a different question than I asked. I'm sorry, Your Honor. I asked, is there any record that this was an area where drugs had been intercepted before? Yes, Agent Capestany testified that that was the reason that he was patrolling the area. They had actually intercepted drugs there before? Correct. That's his testimony? A month and a half earlier, in August. Yes, Your Honor. I can supplement the record and find that exact quote for you if you want. I would like to. Okay, very good. What does this area mean? It's a very remote area. Does it mean the beach or the road where they found the car? It means that remote area of Puerto Rico. I cannot say that specific one mile of beach. I'm not sure about that. There's a remote road, 901, which goes through that area, which, you know, is the only really main road that you can access that area from. So a long road, 901, it's a very rocky, brushy area, and it's hard to access. So it's not suitable for tourism or for fishing and that sort of thing. So they've had problems with this area before, and that's why they were on patrol that evening. But surely, no matter how notorious the area is, you still need something that connects the defendant to the drug dealer. Yes, correct, Your Honor. What connected it was a Sunday evening when they began the patrol at 11 p.m. He went into about 4 o'clock in the morning. They discovered him between 3.30 and 4. During that evening, they saw suspicious activity, cars traveling along that route, which they would not normally see on a Sunday evening. It's a very sparsely populated area there. There was testimony that there were four to five houses. Defense counsel said six. I have no problem assuming. I'm still waiting for something that connects the defendant to the drug dealer. Right. He was present at the scene after they had already spotted the vessel with no lights on. He was present, yeah. He was present at the scene of the Ford excursion with the abandoned gas tanks after they had already spotted the vessel coming in with no lights on along the coast. At that point, they did not know that the vessel had drugs, did they? That's correct, because two local agents had stopped at the Ford while the additional CBP agents had gone off down the path. It was only accessible by foot. The Ford had become stuck in a dry ditch on the side. But they did not know that the vessel had drugs. That is correct. They saw the vessel coming in with its lights out, which there's no reason for a vessel to do at that time of night around 3 o'clock in the morning. It had been a point where they had found drug shipments before, so they were suspicious. There's no reason for anybody to be there at that time of night. As I said, it's not conducive to any kind of recreational activity, really. There are only four to five houses. It was a dead of night. There was brush. He was stumbling out because he could not see. There was testimony that it was dark and he could not see. And he was walking in the direction of the agents. That is correct, and the agents were – Why would someone be suspicious when he's walking towards the agents rather than away from them? Because he could not see. He was stumbling about. It was very pitch black, and there was testimony as to that. One agent had night-vision goggles, and that is the agent that ran into him. The other agent did not and didn't see him at first, in fact. I've interrupted the question that Judge Felia made earlier. I mean, I'm still waiting for an answer to that. So far you've given me a fine answer to justify a Terry stop for reasonable suspicion, but I'm still waiting for something that links the defendant to the drug trafficking or the suspected drug trafficking. And if your only answer is his near presence, I don't think that's going to cut it. Okay. I would say that the near presence case law that's been cited is situations where there's a high crime area, for example, in a housing project where someone's walking down the street. Here you're talking about a situation where it's a very remote area. There's nobody around 3 or 4 o'clock in the morning. Okay. So anyone who was out and about in that area at that time was subject to arrest, no questions asked. That's the government's position? I wouldn't say no questions asked. Well, but that's exactly what happened here. This fellow was merely present. You've got nothing else other than his near presence in the area that connects him with what you suspect to be drug trafficking. And yet he is not detained and questioned, not subjected to a Terry stop, but he's no questions asked, immediately cuffed and arrested. He admitted when he came out of the brush, they asked him questions as to what he was doing, because they needed to secure the area. They don't know at that point if there are weapons. They know that there's a drug shipment coming in. They see the abandoned Ford with supplies, walkie-talkies, food supplies from Venezuela and gas tanks, and they need to make sure that they are safe. So he asked him what he was doing, and the gentleman said, you know, that he was on a boat. He was given $1,000 to unload the ship. That was after he was arrested. Counsel, assume for a moment that trial counsel for this defendant had, in fact, filed a motion to suppress timely in accordance with the pretrial order. Don't you think there's a very good chance that the defendant would have won that motion to suppress? I don't believe there's any reason to suspect that he would have won it. The other two defendants didn't win. Oh, but they're in vastly different situations, vastly different. I think, if anything, it would have been my call that Mercedes had more reason to arrest because he was found so near the crime scene. So I would say no, but... But we don't know now, do we? We don't know, and it's hard to go back and second-guess. It would not have been a frivolous motion. No, I don't think it would have been a frivolous motion. I think it certainly he could have argued that if he chose to. All right. Well, let's switch the emphasis a little, all right? Is there any strategic reason why a reasonably competent defense counsel wouldn't have made such a motion to suppress, a motion which, by your own admission, would not have been frivolous and which his client would have had a chance to win and which would effectively have ended the prosecution? Yes, Your Honor. It's hard for me to go back and say what was in the attorney's head and what his strategy was. No, no, but I'm not asking you to put yourself in the attorney's head. I'm asking you to put yourself in his shoes. That's different. Right. What strategic reason could there be for eschewing a motion to suppress in these circumstances? The only thing that I can think is that perhaps he thought that there really was no point, that he was found near the vessel and there was all of these supplies and they had seen the shipment, the vessel coming in. And so if that judgment is manifestly wrong, right, the judgment that there was no chance of succeeding on a motion to suppress, if that judgment is manifestly wrong, isn't that classic definition almost of ineffective assistance to counsel? If it is wrong? What? I think there's no way for him to – perhaps he didn't think it was wrong. You're saying – But you just told me that the only strategic reason for not making the motion to dismiss is because perhaps defense counsel thought that he couldn't succeed on it, the motion to suppress. I'm sorry, Your Honor. But it may also be that he wished to cross-examine him and – But you can make the motion to suppress and if Winner will lose it, you can still cross-examine. That is true. You can do that. As I said, I can't go back and speak to why the defense attorney chose to pursue certain course. But there seemed to have been an operating assumption by the officers that anyone they found in that area at that time necessarily was connected with the drug deal they knew was going down. Terry's stop would have made sense, but an arrest without asking him anything and without any further evidence, including not knowing whether there were drugs in the area, does seem a bit extreme on the part of the police. It is a bit hard to say at what point they found the drugs. They had to secure him to make sure that there was no danger to them. It is difficult to say how many minutes – this is all taking place in a matter of minutes – how many minutes after they found the drugs that they informed the other officers. I couldn't tell you because I did not see that in the testimony, what the minutes were between the two events. At some point, presumably, the officers communicated with each other that they had found the drugs. And at that point, they already had stopped him to make sure that there was no danger to them because, as I said, it was pitch black and they had evidence of illicit activity going on and they don't want to get shot at or have a situation arise. He did not have a weapon on him. He did not, no, but they didn't know that. No, but they could see him a whole lot better than he could see them. Only because they had night vision goggles. That's right, and if he'd been carrying a rifle or something, they likely would have seen it. Yes, but if he had a handgun or if he had a knife, they probably could not have seen that because, as he said, as defense counsel said, they only saw his silhouette. And I've brought with me the exhibits that are in the record to better illustrate the remoteness of the area because I know that was an issue raised, if you would like it. They are actually in the district court record, but I don't know if you had an opportunity to see them. After argument, provide them to the clerk of our court. It will be easier than asking the district court to go find them again. Certainly. Do your honors have any more questions for me? No, thank you. Thank you. Your honors, I'd like to go directly to this issue of whether this was, in fact, a remote or sparse area because I think, again, the record is incredibly thin for the government on that point. The facts in the record are this is an area off a main state road, 901, in Puerto Rico, with a paved local road. What's the name of this municipality? Is it Yamulcoa or is it what? Your honor, I confess I'm afraid to say it because my Spanish is not so good, but I think it's Menwabo. We give you dispensation. I believe it's Menwabo. Do I have that right? In the southeast section of Puerto Rico. Guanabo? Is that what you said? I believe so. Southeast, your honor. There's a state road. There's a paved road. There's five or six houses where people live. There's a gas station five or ten minutes away where one of the other defendants is arrested. This is rural Puerto Rico. This is not the heart of the Amazonian jungle. It was not reasonable to arrest anyone in that part of Puerto Rico that night simply for being outside, but that's what happened in this case. What's clear what didn't happen, and this goes to questions that both Chief Judge and Judge Selya asked, is there was no carry stop here. It simply wasn't done. They had every opportunity to ask Mr. Mercedes questions when he comes out of the woods. The testimony is he's perfectly relaxed. There's no unprovoked flight. There's no evasive gestures or furtive movements. The officers testified he has no weapon, and they had every opportunity to ask him what he's doing there. Knowing Mr. Mercedes, he likely would have confessed, and at that point they would have had probable cause to conduct an arrest, but instead they arrested first and asked questions only later. I think your honors are focused on all the salient points on the Fourth Amendment issue. I just want to touch briefly on the safety valve issue in case the case does go back and there's a prospect that Mr. Mercedes may face yet another trial, a third trial. The issue with the safety valve is it is mandatory if the five statutory factors are satisfied. The only one to contention here is whether he made a complete and truthful proffer to the government. You may finish. Thank you, Your Honor. This circuit's authority, going back to the Montanez decision, is that there's no magic formula for a proffer. It doesn't need to be sitting in a conference room upstairs at the U.S. Attorney's Office. It can be a statement to an arresting officer immediately upon arrest, which is why we cite the Shrestha and Sherpa cases from the Ninth Circuit, arrests at LAX, and similar drug trafficking cases. There is no question in this case, and neither the government, the court, or probation has ever suggested that the confession Mr. Mercedes makes upon his arrest is incomplete or untruthful in any way. That means he satisfied the fifth criteria, which means he was entitled to the safety valve. The whole purpose of that provision is to mitigate ultra-hard sentences like the 11-year sentence in this case. Under the local rules in Puerto Rico, were we to vacate and remand, would this go back to the same trial judge? Your Honor, I apologize, but I don't know the answer to that question. All right. Counsel for the government, do you know the answer? It would in the ordinary course.  Thank you very much. Thank you, Your Honor.